**Gregory ROTH, individually and behalf of other members of the general public similarly situated, Plaintiff,**

v.

**COMERICA BANK, a Texas Corporation; Comerica Incorporated, a Delaware Corporation; Comerica Management Company, Inc., a Michigan Corporation; and Does 1 through 100, inclusive, Defendants.**

**Case No. CV 10–03818 MMM (PLAx).**

United States District Court, C.D. California.

Aug. 31, 2010.

---

Dina Sera Livhits, Gene F. Williams, Jennifer S. Grock, Orlando J. Arellano, Initiative Legal Group APC, Los Angeles, CA, Edwin Aiwazian, Ghazaleh Hekmat-jah, The Aiwazian Law Firm, Glendale, CA, John Glugoski, Matthew Righetti, Righetti Law Firm PC, San Francisco, CA, for Plaintiff.

Christina M. Hanna, Janel Royce Ablon, Keith A. Jacoby, Scott M. Lidman, Littler Mendelson PC, Los Angeles, CA, for Defendants.

## ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND

MARGARET M. MORROW, District Judge.

On March 19, 2010, Gregory Roth filed this putative class action in Los Angeles Superior Court against Comerica Bank, Comerica Incorporated, and Comerica Management Company, Inc.[1] On May 20, 2010, defendants removed the action to federal court, invoking jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), codified at 28 U.S.C. § 1332(d).[2] Plaintiff has now filed a motion to remand,[3] which defendants have opposed.[4]

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendants employed Roth as a Customer Service Representative or "teller" from June 20, 2005 to May 30, 2008 at a retail banking center in Cerritos, California.[5] In this position, Roth was a non-exempt, hourly employee, earning $13 an hour.[6]

Roth, who is a California resident, alleges that defendants own and operate forty-five Comerica bank centers in California.[7]

---

1. Notice of Removal, Docket No. 1 (May 20, 2010), Exh. A (Complaint).

2. Notice of Removal, ¶ 1.

3. Motion to Remand ("Motion"), Docket No. 13 (June 18, 2010); see also Reply in Support of Motion to Remand ("Reply"), Docket No. 23 (Aug. 9, 2010).

4. Opposition to Motion to Remand ("Opposition"), Docket No. 20 (Aug. 2, 2010).

5. Complaint, ¶ 24; Declaration of Catherine Moye in Support of Removal ("Moye Decl."), Docket No. 5 (May 20, 2010), ¶ 9.

6. Complaint, ¶ 24; Moye Decl., ¶ 9.

7. Complaint, ¶ 12.

He seeks to bring claims on behalf of "[a]ll current and former non-exempt and/or hourly paid tellers, or persons with similar titles and/or similar job duties, who worked for Comerica in the State of California at any time during the period from four years prior to the filing of this Complaint to final judgment." [8] Although Roth asserts that the "membership of the entire class is unknown to [him] at this time," he estimates that the class includes more than one hundred members.[9]

Roth alleges that defendants intentionally and willfully failed to pay overtime wages to him and other class members in violation of California law.[10] He asserts that he was "forced on a regular basis to work overtime without proper compensation, and then he would be told by his superiors to work fewer hours on other days to account for the overtime hours that he worked." [11] More broadly, Roth alleges that defendants failed to pay overtime wages despite the fact that he "and [other] class members regularly and/or consistently worked in excess of eight (8) hours in a day, in excess of twelve (12) hours in a day, and/or in excess of forty (40)hours in a week." [12] Beyond the general assertion that the class members worked unpaid overtime "regularly and/or

consistently," Roth does not allege how frequently class members worked overtime for which they were not properly paid.[13]

Roth also alleges that he and other class members did not receive all meal and rest periods to which they were entitled under California law.[14] The complaint asserts that Roth "and [other] class members often did not take timely, uninterrupted meal periods of not less than thirty (30) minutes," [15] and that "[d]uring the relevant time period, Defendants willfully required Plaintiff and class members to work during rest periods." [16] Further, Roth alleges that class members were not paid one additional hour of regular wages as compensation for the missed meal and rest periods.[17] Roth does not specifically allege how frequently he and other class members were denied the opportunity to take meal or rest periods.

Additionally, Roth asserts that the wage statements provided to class members during their employment were not accurate, and that class members were not paid all wages owed within required payroll periods.[18] Finally, he alleges that defendants failed to pay all wages owed when class members finished their employment.[19] He does not specify how many class members

8. *Id.,* ¶ 19.

9. *Id.,* ¶ 21.

10. *Id.,* ¶ 28.

11. *Id.* At oral argument, plaintiff's counsel agreed with defendant's characterization of his overtime allegation as a "systematic off-the-clock" claim. Plaintiff's counsel asserted that defendants' managers "shift[ed] hours" by having employees work more than eight hours one day and less than eight hours the next. The managers purportedly considered the extra overtime hours worked the first day as having been worked the second day. As a result, employees were allegedly denied overtime wages for the time worked in excess of eight hours on the first day.

12. *Id.,* ¶ 40.

13. Roth also asserts that he "was often not paid an overtime rate for the overtime hours that he worked...." (*Id.,* ¶ 31.)

14. *Id.,* ¶¶ 29–30.

15. *Id.,* ¶ 53.

16. *Id.,* ¶ 63.

17. *Id.*

18. *Id.,* ¶¶ 31–33.

19. *Id.,* ¶¶ 73–78.

left defendants' employ during the class period or how many were not paid their wages on termination.

Based on theses allegations, Roth asserts eight state law causes of action on his behalf and on behalf of the class: (1) failure to pay overtime wages in violation of California Labor Code §§ 510 and 1198; (2) requiring class members to work during meal periods and failing to compensate them members for missed meal periods in violation of California Labor Code §§ 226.7 and 512(a); (3) requiring class members to work during rest periods and failing to compensate class members for missed rest periods in violation of California Labor Code § 226.7; (4) failure to pay class members an overtime rate for overtime hours worked or a regular rate for hours worked during meal periods in violation of California Labor Code §§ 1194, 1197, and 1197.1; (5) failure to pay former employees all wages owed within seventy-two hours of the conclusion of their employment in violation of California Labor Code §§ 201 and 202; (6) failure to pay all wages owed to class members within required payroll periods in violation of California Labor Code § 204; (7) failure to furnish accurate time records to class members in violation of California Labor Code § 226(a); and (8) unlawful business practices in violation of California Business and Professions Code §§ 17200 *et seq.*[20]

In his prayer for relief,[21] Roth seeks, *inter alia*, to recover (1) class members' unpaid overtime wages; (2) one hour of regular wages for each day a class member was denied a required meal period; (3) one hour of regular wages for each day a class member was denied a required rest period; (4) statutory penalties under California Labor Code § 1197.1 for failure to pay class members minimum required wages;[22] (5) statutory penalties under California Labor Code § 203 for failure to pay class members all wages earned within thirty days of the date their employment ended;[23] (6) statutory penalties under California Labor Code § 210 for failure to pay all wages owed within specified payroll periods as required by § 204;[24] (7) statutory penalties under California Labor Code § 226 for failure to provide accurate

---

20. *Id.,* ¶¶ 35–97.

21. *Id.* at 18–22.

22. California Labor Code § 1197.1(a) provides: "Any employer . . . who pays or causes to be paid to any employee a wage less than the minimum fixed by an order of the [labor] commission shall be subject to a civil penalty as follows: (1) For any initial violation that is intentionally committed, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee is underpaid. (2) For each subsequent violation for the same specific offense, two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed."

23. California Labor Code § 203(a) states in relevant part: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

24. Under California Labor Code § 204(a), "[a]ll wages, other than those mentioned in Section 201, 201.3, 202, 204. 1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays." Section 210 provides that employers that fail to adhere to this requirement "shall be subject to a civil penalty as follows: (1) For any initial violation, one hundred dollars ($100) for each failure to pay each employee. (2) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld."

wage statements to class members;[25] and (8) reasonable attorneys' fees. While Roth alleges that his damages total less that $75,000,[26] he does not specify or limit the total recovery sought on behalf of the class.

On May 18, 2010, defendants answered Roth's complaint, asserting, *inter alia,* that Roth's claims were barred in whole or in part by the one-year statute of limitations governing statutory penalties under California Code of Civil Procedure § 340(a), the three-year statute of limitations set forth in § 338(a), and the four-year statute of limitations in California Business and Professions Code § 17208.[27]

Two days later, on May 20, 2010, defendants removed the action to federal court, invoking CAFA jurisdiction under 28 U.S.C. § 1332(d).[28] Defendants contend there is complete diversity of citizenship between them and plaintiff, that the class includes more than 100 members, and that the amount in controversy exceeds $5 million.[29]

In support of removal, defendants proffered the declaration of Catherine Moye, the senior vice president in charge of administrative management for defendant Comerica Management Company ("CMC").[30] Moye states that Comerica International is a Delaware corporation with its principal place of business in Texas,[31] that Comerica Bank is a subsidiary of Comerica International with its principal place of business in Texas,[32] and that CMC is a subsidiary of Comerica Bank, which is incorporated and based in Michigan.[33]

Moye asserts that CMC employed Roth from June 20, 2005 to May 30, 2008 as a customer service representative or "teller" at a branch in Cerritos, California, at an hourly wage of $13.[34] She represents that since March 19, 2006, CMC has employed 796 former or current tellers in California.[35] These 796 tellers collectively worked approximately 65,413 weeks during the class period.[36] CMC employees are

---

**25.** California Labor Code § 226(a) provides that "[e]very employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees ... an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee ... and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." Section 226(e) provides that "[a]n employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees."

**26.** Complaint, ¶ 1.

**27.** Notice of Removal, Exh. B (Answer).

**28.** Notice of Removal, ¶ 1.

**29.** *Id.,* ¶¶ 10–45.

**30.** Moye Decl., ¶ 1. Moye represents that although Comerica Bank and Comerica Incorporated are the parent companies of CMC, she has access to information regarding the employees and operations of these companies as well. (*Id.,* ¶ 3).

**31.** *Id.,* ¶ 4.

**32.** *Id.,* ¶ 5.

**33.** *Id.,* ¶ 6.

**34.** *Id.,* ¶ 9. Although defendants acknowledge that most tellers earn approximately $20 an hour, they have based all of their calculations concerning the amount in controversy on Roth's $13 hourly wage.

**35.** *Id.,* ¶ 8.

**36.** *Id.,* ¶ 7. Plaintiff asserts that Moye's testimony regarding "the number of former and current employees and hourly rate" is insufficiently supported because she "fails to explain

paid every two weeks, such that there are a total of twenty-six pay periods in a year.[37] Between March 19, 2009 and March 19, 2010, CMC employed at least 251 tellers for the entire year.[38] During the past three years, 318 tellers ended their employment with CMC.[39]

Defendants also proffered the declaration of Keith A. Jacoby.[40] Jacoby has been lead defense counsel in two prior wage and hour class actions initiated by parties who were represented by Initiative Legal Group APC ("ILG"), one of the three law firms currently representing plaintiff.[41] Jacoby asserts that following settlement in both cases, ILG sought more than $1 million in attorneys' fees.[42] In an action that settled for $5 million, for example, ILG, with two other firms, sought and was awarded fees of $1,666,667.[43] In a suit that settled for $3 million, ILG, together with three other firms, sought and was awarded attorneys' fees of $1 million.[44]

## II. DISCUSSION

### A. Legal Standard Governing Removal Jurisdiction under CAFA

The right to remove a case to federal court is entirely a creature of statute.

See, e.g., *Libhart v. Santa Monica Dairy Co.*, 592 F.2d 1062, 1064 (9th Cir.1979) ("The removal jurisdiction of the federal courts is derived entirely from the statutory authorization of Congress" (citations omitted)). The removal statute, 28 U.S.C. § 1441, allows defendants to remove when a case originally filed in state court presents a federal question or is between citizens of different states. See 28 U.S.C. §§ 1441(a), (b); see also 28 U.S.C. §§ 1446 (setting forth removal procedures generally); 1453 (setting forth removal procedures for class actions). Only those state court actions that could originally have been filed in federal court may be removed. 28 U.S.C. § 1441(a) ("Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant ... to the district court of the United States for the district and division embracing the place where such action is pending . . . ."); see also, e.g., *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) ("Only state-court actions that originally could have

---

how she arrived at these numbers." (Motion at 5 n. 3). Moye states, however, that the information she has included in her declaration is based on her position at CMC and her review of the company's reports, payroll records, and operations. (Moye Decl., ¶¶ 1–3). The court thus concludes that the testimony is based on personal knowledge and overrules any objection on this ground. *See Mora v. Harley–Davidson Credit Corp.*, No. 1:08–cv–01453 OWW GSA, 2009 WL 464465, *4 n. 1 (E.D.Cal. Feb. 24, 2009) (overruling an objection to testimony by of a corporate director of customer solutions concerning customer credit figures where the testimony was based on a review of company records).

37. *Id,* ¶ 10.

38. *Id.,* ¶ 7.

39. *Id.*

40. Declaration of Keith A. Jacoby in Opposition to Plaintiff's Motion for Remand ("Jacoby Decl."), Docket No. 20 (Aug. 2, 2010).

41. *Id.,* ¶ 2. Plaintiff is presently represented by Dina Sera Livhits, Gene F. Williams, Jennifer S. Grock, and Orlando J. Arellano of ILG. Plaintiff is also represented by Edwin Aiwazian and Ghazaleh Hekmatjah of the Aiwazian Law Firm, and Matthew Righetti and John Glugoski of Righetti Glugoski PC.

42. *Id.,* ¶¶ 3–6.

43. *Id.,* ¶ 4, Exh. B (Notice of Motion for Attorneys' Fees).

44. *Id.,* ¶ 6, Exh. D (Motion in Support of Preliminary Approval of Class Settlement).

been filed in federal court may be removed to federal court by defendant").

In 2005, Congress enacted the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109–2, 119 Stat. 4. CAFA gives district courts original jurisdiction to hear class actions "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and "in which[, *inter alia,*] any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2); see also *Luther v. Countrywide Home Loans Servicing LP,* 533 F.3d 1031, 1033–34 (9th Cir.2008) ("The Class Action Fairness Act of 2005 § 4(a), 28 U.S.C. § 1332(d)(2), amended the requirements for diversity jurisdiction by granting district courts original jurisdiction over class actions exceeding $5,000,000 in controversy where at least one plaintiff is diverse from at least one defendant. In other words, complete diversity is not required. CAFA also provided for such class actions to be removable to federal court. See 28 U.S.C. § 1453(b). CAFA was enacted, in part, to 'restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction.' Pub. L. No. 109–2, § 2(b)(2), 119 Stat. 4, 5 (codified as a note to 28 U.S.C. § 1711)").

Under CAFA, the number of members of all proposed plaintiff classes must exceed 100 in the aggregate. 28 U.S.C. § 1332(d)(5)(B). See also *Serrano v. 180 Connect, Inc.,* 478 F.3d 1018, 1020–21 (9th Cir.2007) ("As a threshold matter, CAFA applies to 'class action' lawsuits where the aggregate number of members of all proposed plaintiff classes is 100 or more persons and where the primary defendants are not 'States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief.' § 1332(d)(5).... Once the

prerequisites of § 1332(d)(5) are satisfied, CAFA vests federal courts with 'original' diversity jurisdiction over class actions if (1) the aggregate amount in controversy exceeds $5,000,000, and (2) any class member is a citizen of a state different from any defendant. § 1332(d)(2)"); *id.* at 1021 n. 3 ("The Fifth Circuit characterized § 1332(d)(5) as an 'exception' to CAFA jurisdiction conferred under § 1332(d)(2).... We view § 1332(d)(5) somewhat differently.... [S]atisfaction of § 1332(d)(5) serves as a prerequisite, rather than as an exception, to jurisdiction under § 1332(d)(2). This distinction is important because, as we address later, there are 'exceptions' to the statute in which jurisdiction otherwise exists under § 1332(d)(2) but the federal courts either *may* or *must* decline to exercise that jurisdiction. See, e.g., § 1332(d)(3)-(4)").

The Ninth Circuit "strictly construe[s] the removal statute[s] against removal jurisdiction." *Gaus v. Miles, Inc.,* 980 F.2d 564, 566 (9th Cir.1992) (citing *Boggs v. Lewis,* 863 F.2d 662, 663 (9th Cir.1988) and *Takeda v. Northwestern Nat'l Life Ins. Co.,* 765 F.2d 815, 818 (9th Cir.1985)). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Id.* (citing *Libhart v. Santa Monica Dairy Co.,* 592 F.2d 1062, 1064 (9th Cir.1972)). "The 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (citing *Nishimoto v. Federman–Bachrach & Assocs.,* 903 F.2d 709, 712 n. 3 (9th Cir.1990) and *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1195 (9th Cir.1988)).

As the Ninth Circuit has. explained, CAFA does not disturb the traditional rule that the burden of establishing removal jurisdiction is on the proponent of federal jurisdiction. *Abrego v. The Dow Chemical Co.,* 443 F.3d 676, 685 (9th Cir.2006) ("We

... hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction").

### B. Legal Standard Governing the Amount–in–Controversy Requirement under CAFA

 Roth contends that defendants have failed to establish that the amount in controversy exceeds $5 million.[45] Although it has affirmed that the burden of proving federal jurisdiction rests with defendants, the Ninth Circuit has distinguished three situations in terms of the *level* of proof defendants must adduce. "First, when the plaintiff fails to plead a specific amount of damages, the defendant seeking removal 'must prove by a preponderance of the evidence that the amount in controversy requirement has been met.'" *Lowdermilk v. U.S. Bank National Ass'n,* 479 F.3d 994, 998 (9th Cir.2007) (quoting *Abrego,* 443 F.3d at 683). See also *Guglielmino v. McKee Foods Corp.,* 506 F.3d 696, 699 (9th Cir.2007) ("[W]here it is unclear or ambiguous from the face of a state-court complaint whether the requi-

site amount in controversy is pled ... we apply a preponderance of the evidence standard"); *Matheson v. Progressive Specialty Ins. Co.,* 319 F.3d 1089, 1090 (9th Cir.2003) (per curiam); *Singer v. State Farm Mutual Auto. Ins. Co.,* 116 F.3d 373, 376 (9th Cir.1997). "Second, if the complaint alleges damages in excess of the federal amount-in-controversy requirement, then the amount-in-controversy requirement is presumptively satisfied unless 'it appears to a 'legal certainty' that the claim is actually for less than the jurisdictional minimum.'" *Id.* (quoting *Abrego,* 443 at 683 n. 8). Where plaintiff alleges that his "damages are less than the [$5,000,000] jurisdictional amount," however, "the party seeking removal must prove with legal certainty that CAFA's jurisdictional amount is met." *Id.* at 1000.

It is undisputed that Roth's complaint does not allege the amount of class damages sought. Consequently, it is unclear from the face of the complaint whether the amount-in-controversy requirement has been met, and defendants must show by the preponderance of the evidence that it is satisfied.[46] See *Korn v. Polo Ralph*

**45.** The parties do not dispute that the other requirements for federal jurisdiction under 28 U.S.C. § 1332(d)(2) are met, namely, that Roth and defendants are citizens of different states and that the putative class has more than 100 members. Citing *Abrego,* Roth mistakenly argues in reply that defendants must also establish that his individual claims exceed $75,000 to establish jurisdiction under CAFA. (Reply at 10–11). This argument conflates CAFA's jurisdictional requirements for traditional class actions—set forth in 28 U.S.C. § 1332(d)(2)—with the jurisdictional requirements for "mass actions" under § 1332(d)(11). In *Abrego,* the Ninth Circuit affirmed the district court's remand of a mass action in part because defendant had failed to show that any individual plaintiff's claim exceeded $75,000. See *Abrego,* 443 F.3d at 689 ("[Defendant] Dow, however, has not established that even one plaintiff satisfies the $75,000 jurisdictional amount requirement of § 1332(a), applicable to *mass actions* by vir-

tue of § 1332(d)(11)(B)(i)" (emphasis added)). Because Roth has filed a traditional class action, not a mass action that would be subject to additional requirements under § 1332(d)(11), defendants need not show that each putative class member's claims exceed $75,000. See *id.* at 680 ("Section 1332(d), added by CAFA, vests the district court with 'original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a *class action* in which' the parties satisfy, among other requirements, minimal diversity" (emphasis added)).

**46.** Although conceding that the complaint "does not allege any specific amount in controversy," (Reply at 1), plaintiff frequently cites cases that apply the legal certainty standard. See, e.g., *Green v. Staples Contract & Commercial, Inc.,* No. 08–07138 SVW (JWJx), 2008 WL 5246051 (C.D.Cal. Dec. 10, 2008); *Fletcher v. Toro,* No. 08–CV–2275 DMS

*Lauren Corp.,* 536 F.Supp.2d 1199, 1204 (E.D.Cal.2008) (applying the preponderance of the evidence standard where plaintiff's class action complaint failed to specify the amount of damages sought, citing *Singer,* 116 F.3d at 376). See also *Abrego,* 443 F.3d at 683 ("Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met").

### C. Whether Defendants Have Established by a Preponderance of the Evidence That the Amount–in–Controversy Requirement is Met

Roth argues that defendants' calculations regarding potential class damages are factually unsupported and too speculative to establish that the amount in controversy exceeds $5 million.[47] Defendants counter that their estimate is supported by evidence and plaintiff's allegations.[48]

■ "In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint." *Kenneth Rothschild Trust v. Morgan Stanley Dean Witter,* 199 F.Supp.2d 993, 1001 (C.D.Cal.2002) (citing *Jackson v. American Bankers Ins. Co. of Florida,* 976 F.Supp. 1450, 1454 (S.D.Ala. 1997)). See also *Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1096 (11th Cir.1994) (the amount in controversy analysis presumes that "plaintiff prevails on liability"). "The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe."

*Korn,* 536 F.Supp.2d at 1205 (citing *Rippee,* 408 F.Supp.2d at 986).

■ Where defendants must show that the amount-in-controversy requirement is satisfied by a preponderance of the evidence, "the court may consider facts in the removal petition, and may 'require parties to submit summary judgment-type evidence relevant to the amount in controversy at the time of removal.'" *Singer,* 116 F.3d at 377 (citing *Allen v. R & H Oil & Gas Co.,* 63 F.3d 1326, 1335–36 (5th Cir. 1995)). See also *Valdez v. Allstate Ins. Co.,* 372 F.3d 1115, 1117 (9th Cir.2004) ("Although we have not addressed the types of evidence defendants may rely upon to satisfy the preponderance of the evidence test for jurisdiction, we have endorsed the Fifth Circuit's practice of considering facts presented in the removal petition as well as any summary-judgment-type evidence relevant to the amount in controversy at the time of removal," quoting *Matheson,* 319 F.3d at 1090 (internal quotations omitted)); *Kenneth Rothschild Trust,* 199 F.Supp.2d at 1001 ("If the amount in controversy is not clear on the face of the complaint, ... defendant must do more than point to a state law that might allow recovery above the jurisdictional minimum").

■ To meet their burden, "defendant[s] must provide evidence establishing that it is 'more likely than not' that the amount in controversy exceeds [the jurisdictional threshold]." *Sanchez v. Monumental Life Ins. Co.,* 102 F.3d 398, 404 (9th Cir.1996). They are not required to " 'research, state, and prove the plaintiff's claims for damages,' " however. *Coleman*

---

(WMc), 2009 WL 8405058, 2009 U.S. Dist. LEXIS 126693 (S.D.Cal. Feb. 3, 2009); *Riddoch v. McCormick & Schmicks Seafood Rests., Inc.,* CV 09–7127 ODW (MANx), 2010 U.S. Dist. LEXIS 65799 (C.D. Cal. June 28, 2010). Because the appropriate standard here is preponderance of the evidence, these cases are inapposite and the court does not discuss them here.

**47.** Motion at 4–10.

**48.** Opposition at 6–17.

*v. Estes Express Lines, Inc.,* 730 F.Supp.2d 1141, 1147–48 (C.D.Cal.2010) (quoting *Muniz v. Pilot Travel Centers LLC,* No. S–07–0325 FCD EFB, 2007 WL 1302504, *2 (E.D.Cal. April 30, 2007)). Nonetheless, a court "cannot base [a finding of] jurisdiction on a [d]efendant's speculation and conjecture." *Lowdermilk,* 479 F.3d at 1002. "Rather, a defendant must set forth the underlying facts supporting its assertion that the amount in controversy exceeds the statutory minimum." *Korn,* 536 F.Supp.2d at 1205 (citing *Gaus,* 980 F.2d at 567).

In evaluating whether defendants have met that burden here, the court will first address the manner in which defendants estimate various categories of potential damages, and thereafter examine the reliability of the variables defendants used, in order to determine if they have shown that it is more likely than not that damages exceed $5,000,000.

### 1. Defendants' Estimate of Potential Class Damages

Defendants' estimate of the amount in controversy is based on eight types of relief sought in plaintiff's complaint:

| No. | Claim | Defs.' Estimated Amount in Controversy[49] |
|---|---|---|
| 1. | Unpaid overtime | $3,826,660 to $6,377,767 |
| 2. | Missed meal periods | $850,369 to $2,551,107 |
| 3. | Missed rest periods | $850,369 to $2,551,107 |
| 4. | Penalties under § 1197.1 for failure to pay all required wages | $1,593,850 |
| 5. | Penalties under § 210 for failure to pay all wages within specified payroll periods | $1,280,100 |
| 6. | Penalties under § 226 for failure to provide accurate wage statements | $1,004,000 |
| 7. | Penalties under § 203 for failure to pay all wages within thirty days of the end of employment | $992,160 |
| 8. | Attorneys' fees | $1,000,000 |
| | **Total** | **$11,397,508 to $17,350,091** |

In estimating the value of the class claims, defendants have calculated potential unpaid overtime and meal/rest period claims for the entire four-year class period alleged in the complaint, but assumed that a one-year limitations period applies to claims under California Labor Code §§ 1197.1, 210, and 226. In estimating the value of potential class claims under Labor Code § 203, defendants calculated possible waiting time penalties for the 318 putative class members who left their employ in the past three years, effectively applying the three-year limitations period for actions upon a liability created by statute, other than a penalty or forfeiture. See Cal. Code Civ. Proc. § 338(a). Roth has not objected to defendants' use of an incorrect limitations period on his overtime wages and meal and rest period claims.[50] The

**49.** Notice of Removal, ¶ 42; Opposition at 17, 19.

**50.** The California Supreme Court has held that "[a] three-year statute of limitations applies to [claims for wages] (Code Civ. Proc., § 338, subd. (a)) ('An action upon a liability created by statute, other than a penalty or forfeiture'), while a one-year statute of limitations governs claims for penalties (Code Civ. Proc., § 340, subd. (a)) ('An action upon a statute for a penalty or forfeiture')." *Murphy v. Kenneth Cole Productions, Inc.,* 40 Cal.4th 1094, 1102, 1120, 56 Cal.Rptr.3d 880, 155 P.3d 284 (2007) (affirming use of a three-year statute of limitations for claims under California Labor Code § 226.7 for missed meal/rest

court notes, however, that this has inflated defendants' estimate of damages on the two claims by at least 25 percent.[51]

## (a) Unpaid Overtime Claims

■ In estimating that class claims for unpaid overtime are in the $3,826,660 to $6,377,767 range, defendants "[a]ssum[e] the 796 potential class members are owed three to five hours of overtime per work-week."[52] Because Moye states that class members collectively worked approximately 65,413 weeks during the class period,[53] defendants have multiplied 65,413 weeks by 3 or 5 hours, and multiplied the resulting number by $19.50, plaintiff's standard

overtime wage, to obtain the high and low ends of the range.[54]

The hourly wage of $19.50 that defendants use in this calculation, however, does not reflect the overtime claim asserted in the complaint. Roth alleges that he "was often not paid an *overtime rate* for the overtime hours that he worked."[55] He does not allege that he was paid less than his regular wage of $13 an hour for such work.[56] Defendants thus should have based their calculation on the additional $6.50 per hour Roth was entitled to receive for overtime work, not on the total overtime wage of $19.50. When this figure is used, it appears that the potential value of the overtime claim is $1,275,553.50 to $2,125,922.50.[57] More significantly, defen-

periods); see also *Gentry v. Superior Court*, 42 Cal.4th 443, 470–71, 64 Cal.Rptr.3d 773, 165 P.3d 556 (2007) (noting that generally California Code of Civil Procedure § 338's three-year statute of limitations applies to claims for overtime wages). If the correct three-year statute of limitations is applied to plaintiff's overtime and meal period/rest period claims, defendants' estimation of potential damages on these claims is immediately overstated by 25 percent, or perhaps by more, depending on the number of class members who were employed during the past three years. Because the court concludes that defendants' calculations of the amount in controversy are not sufficiently supported on other grounds, the court need not determine which limitations period applies to each of plaintiff's claims or whether defendants' arguments in support of removal indicate an intent to waive their limitations defense.

51. Roth asserts a class period running for the four years prior to the filing of the complaint. (Complaint, ¶ 19). The proposed class period appears to be based on the four-year limitations period associated with plaintiff's Business & Professions Code § 17200 claim. See CAL. BUS. & PROF.CODE § 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued"). Although defendants have relied on the four-year class period in estimating class claims for unpaid overtime and missed meal/rest periods, none of defendants' calculations is based on plaintiff's claim under § 17200.

52. Notice of Removal, ¶ 29.

53. Moye Decl., ¶ 7.

54. $65,413 \times 3 \times \$19.50 = \$3,826,660.50$; $65,413 \times 5 \times \$19.50 = \$6,377,767$. Defendants calculate overtime using plaintiff's regular wage of $13 an hour $\times 1.5$. (Notice of Removal, ¶¶ 30–31).

55. Complaint, ¶ 31 (emphasis added).

56. The complaint alleges that Roth was "forced on a regular basis to work overtime without *proper compensation*, and then he would be told by his superiors to work fewer hours on other days to account for the overtime hours that he worked." (*Id.*, ¶ 28 (emphasis added)). This allegation clearly suggests that Roth's superiors were attempting to avoid paying Roth a higher overtime wage, not that they were avoiding paying him for those hours altogether.

57. $65,413 \times 3 \times \$6.50 = \$1,275,553.50$; $65,413 \times 5 \times \$6.50 = \$2,125,922.50$. If the three-year limitations period of Code of Civil Procedure § 338 were used, this amount would be further reduced to a range of $956,665.12 to $1,594,494.30. Even if the $20 an hour wage cited by Moye were used across a four-year class period, potential damages on the claim would not exceed the jurisdictional threshold. Using a $10 an hour increase for overtime performed by an employee whose regular wage was $20, for ex-

dants' calculation admittedly rests on the speculative assumption that every class member was denied three to five hours of overtime pay every week.[58]

**(b) & (c) Meal and Rest Period Claims**

■ In estimating a combined total of $1,700,738 to $5,102,214 in class damages for missed meal and rest periods, defendants "assume for purposes of CAFA removal only, that such alleged violations occurred one to three times per workweek during the putative class period (i.e. during the 65,413 workweeks)."[59] Assuming class members can recover one hour of wages per violation, defendants multiply 65,413 weeks by one to three violations, and multiply the resulting numbers by $13 to estimate the amount in controversy for meal period violations.[60] They perform a similar calculation to determine additional damages related to rest period violations.[61]

California Labor Code § 226.7 states, however, that "[i]f an employer fails to provide an employee a meal period or rest period ..., the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided." thus, an employee is entitled to an additional hour's wages per day, even if denied both a rest and meal period during that day. See *Lyon v. W.W. Grainger, Inc.*, No. C 10–00884

WHA, 2010 WL 1753194, *4 (N.D.Cal. Apr. 29, 2010) (holding that defendant's calculation of the amount in controversy with respect to missed meal and rest breaks was too high because it assumed "recovery for each violation instead of one recovery per day"). While it is theoretically possible that no class member missed meal and rest periods on the same day, defendants have proffered no evidence that would permit the court to draw such an inference.

Accordingly, defendants' calculation for meal and rest period violations essentially doubles the amount realistically recoverable under the statute. See *id.* (finding that defendant's estimate was "off by a magnitude of two"). Further, even a lowered estimate of $850,369 to $2,551,107 for both meal and rest period violations necessarily relies on the assumption that every class member missed one to three such periods a week.[62] Like defendants' assumption that all class members worked 3 to 5 hours of overtime each week for which they did not receive overtime wages, the suggestion that each class member missed one to three meal or rest periods per week is entirely unsupported in the record.[63]

**(d) Penalties under Labor Code § 1197.1**

■ California Labor Code § 1197.1(a) provides:

---

ample, the calculation would be: 65,413 × 3 × $10 = $1,962,390; 65,413 × 5 × $10 = $3,270,650.

**58.** Plaintiff's counsel noted at oral argument that many potential class members worked only part-time, making overtime estimates for these employees substantially different than those for full-time employees. To the extent this is true, defendants' calculation does not take this variable into account.

**59.** Notice of Removal, ¶¶ 34–36.

**60.** 65,413 × 1 × $13.00 = $850,369; 65,413 × 3 × $13.00 = $2,551,107. (*Id.*, ¶ 35.)

**61.** *Id.*, ¶ 36.

**62.** Applying the three year limitations period prescribed by Code of Civil Procedure § 338, the range would be reduced still further, from $637,776.75 to $1,913,330.20.

**63.** Indeed, plaintiff's counsel stated at oral argument that many of the putative class members worked part-time. To the extent this is true, any estimate of required meal/rest periods for these employees would necessarily differ from that of full-time employees—a distinction not reflected in defendants' calculations.

"Any employer ... who pays or causes to be paid to any employee a wage less than the minimum fixed by an order of the [labor] commission shall be subject to a civil penalty as follows: (1) For any initial violation that is intentionally committed, one hundred dollars ($100) for each underpaid employee for each pay period for which the employee is underpaid. (2) For each subsequent violation for the same specific offense, two hundred fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid regardless of whether the initial violation is intentionally committed."

In calculating potential class claims of $1,593,850 under § 1197. 1, defendants "[a]ssum[e] putative class members are entitled to recover for violations for each pay period (i.e., every two weeks) from March 19, 2009 to March 19, 2010." [64]

Based on CMC's practice of paying employees twenty-six times a year, defendants calculate that the 251 class members employed throughout the past year may each have a claim under § 1197.1 for $6,350: $100 for the initial violation plus $250 × 25 for each subsequent pay period. They therefore estimate total potential penalties under § 1197.1 of $1,593,850.[65] This calculation is premised, however, on an assumption that defendants failed to pay proper wages to every class member employee during every pay period of the year. Once again, defendants adduce no evidence that would permit the court to draw such an inference.

**(e) Penalties Under Labor Code § 210**

■ Under California Labor Code § 204(a), "[a]ll wages, other than those

mentioned in Section 201, 201.3, 202, 204. 1, or 204.2, earned by any person in any employment are due and payable twice during each calendar month, on days designated in advance by the employer as the regular paydays." Section 210 provides that employers who fail to adhere to this requirement "shall be subject to a civil penalty as follows: (1) For any initial violation, one hundred dollars ($100) for each failure to pay each employee. (2) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld."

In making their calculation of § 204 penalties, defendants again "assume the 251 [tellers] are entitled to recover for violations in each pay period (i.e., every two weeks) from March 19, 2009 to March 19, 2010." [66] Based on twenty-six pay periods, defendants estimate that each class members employed during the past year could recover $5,100 in § 210 penalties: $100 for the initial violation plus $200 × 25 for each subsequent violation.[67] Given that Moye states 251 tellers were employed for the full year from March 19, 2009 to March 19, 2010, defendants estimate potential penalties under § 210 of $1,280,100.[68] As with their estimate of § 1197.1 penalties, defendants' calculation assumes that they failed to make timely payment of wages to every class member during every pay period of the year. Defendants proffer no evidence indicating that this assumption is reasonable, however.

**(f) Penalties under Labor Code § 226**

■ California Labor Code § 226(a) provides that "[e]very employer shall, sem-

---

**64.** Notice of Removal at 8 n. 1.

**65.** 251 × $6,350 = $1,593,850.

**66.** Notice of Removal, ¶ 33.

**67.** In calculating the potential class claim under § 210, defendants do not estimate 25 percent of the amounts that were purportedly withheld unlawfully.

**68.** 251 × $6,350 = $1,280,100.

imonthly or at the time of each payment of wages, furnish each of his or her employees ... an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee ... and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee." Section 226(e) provides that "[a]n employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees."

In calculating potential class claims of $1,004,000 related to alleged violations of § 226, "[d]efendants assume the 251 [tellers] are entitled to recover for violations in each pay period (i.e., every two weeks) from March 19, 2009 to March 19, 2010." [69] As can be seen, they once again assume a 100 percent violation rate—i.e., that they provided every employee an inaccurate wage statement for every pay period during the limitations period. As with their other assumptions, defendants adduce no evidence permitting the court to draw such an inference. Further, they presume that each class member will recover the maximum aggregate penalty of $4,000, citing Roth's allegation that he "and [other]

class members are entitled to recover from Defendants the greater of their actual damages ... or an aggregate penalty not exceeding four thousand dollars per employee." [70] This assumption, however, is suspect; unless class members can demonstrate actual damage flowing from receipt of an inaccurate wage statement, they will be entitled to recover $50 for the first violation and $100 for every violation thereafter. Since defendants assume twenty-six pay periods, this would amount only to $2,550.[71] Using this $4,000 figure, defendants estimate damages under § 266 of $1,004,000.[72]

#### (g) Violations of Labor Code § 203

■ California Labor Code § 203(a) states in relevant part: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

In estimating the potential class recovery of waiting-time penalties under § 203, defendants "assum[e] an 8–hour workday multiplied by the previously stated average hourly rate of $13," or $104 per day.[73] They further assume that each former employee would be able to recover thirty days of penalties.[74] Based on Moye's statement that 318 employees resigned or were terminated during the past three years, de-

---

69. Notice of Removal, ¶ 41.

70. Opposition at 17 (quoting Complaint ¶ 90).

71. In their notice of removal, defendants calculated total damages under § 226(e) using this lower figure. Specifically, they estimated the recovery on this claim at $640,050: $50 for the first violation and $100 for twenty-five

subsequent violations = $2,550 per teller × 251 tellers = $640,050.

72. 251 tellers × $4000 = $1,004,000.

73. Notice of Removal, ¶¶ 37–39.

74. Id., ¶ 39.

fendants estimate a potential class recovery of $992,160.[75] As with other aspects of their damages estimate, however, the calculation assumes that amounts owed are not paid for a full thirty days after termination, and that all employees worked full-time rather than part-time. Once again, defendants adduce no evidence supporting these assumptions.

### (h) Attorneys' Fees

 Defendants note that plaintiff seeks to recover attorneys' fees, *inter alia,* under California Labor Code § 218.5. See CAL. LAB.CODE § 218.5 ("In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action"). Attorneys' fees may be included in the calculation of the amount in controversy supporting CAFA jurisdiction. See *Galt v. Scandinavia,* 142 F.3d 1150, 1156 (9th Cir.1998) ("We hold that where an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy"). See also *Lowdermilk,* 479 F.3d at 1000.

Defendants argue that "it is typical for an attorneys' fees award in California wage and hour class actions to be at least 25 percent of the settlement or award." [76] As defendants provide no evidentiary support for this assertion, the court declines to consider it. Defendants also suggest

that plaintiff's counsel has sought fees of $1 million or more in actions similar to this one. Specifically, defendants proffer evidence that in a matter that settled for $5 million, class counsel, which included ILG, one of the law firms currently representing plaintiff, sought and were awarded fees of $1,666,667. They also adduce evidence that in a matter which settled for $3 million, ILG and its class co-counsel sought and were awarded attorneys' fees of $1 million.[77]

Defendants therefore suggest that estimating attorneys' fees at $1 million is proper. This amount assumes that the class's potential recovery on other claims is in the $3 to $5 million range.

### 2. Whether the Assumptions on Which Defendants' Calculation of the Amount in Controversy Is Based Are Supported by "Summary Judgment Type Evidence"

As noted, defendants' valuation of the class's unpaid overtime claim and missed meal/rest periods claim overstate the potential amount in controversy by $3,401,475.50 to $6,802,951.50.[78] Even when this error is corrected, if the court were to accept all of the other assumptions on which the calculations are based, the amount in controversy would be between $7,996,075 to $10,547,140—well above the jurisdictional threshold.

 Roth contends, however, that it would be inappropriate to accept defendants' assumptions. He argues that the calculations are based on "speculation and conjecture," and represent nothing more

---

**75.** $104 × 30 days × 318 former employees = $992,160.

**76.** Opposition at 19.

**77.** Jacoby Decl., ¶¶ 3–6.

**78.** As noted, assuming *arguendo* the validity of all of defendants' other variables, the court

calculated potential unpaid overtime claims of $1,275,553.50 to $2,125,922.50, rather than $3,826,660 to $6,377,767. The court found that the meal and rest period claims were overstated by $850,369 to $2,551,107. Combining the two claims results in an overstatement of $3,401,475.50 to $6,802,951.50.

than "flawed guessing." [79] Noting that defendants adduce no evidence to support some of the variables that are key to their calculations, He asserts that defendants have failed to meet their burden of establishing by a preponderance of the evidence that the amount in controversy exceeds $5 million. See *Abrego*, 443 F.3d at 683 ("Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a preponderance of the evidence that the amount in controversy requirement has been met"). Specifically, Roth argues that key variables included in defendants' calculations are not based on summary judgment-type evidence. *Singer*, 116 F.3d at 377 ("The district court may consider ... facts in the removal petition, and may 'require parties to submit summary-judgment-type evidence relevant to the amount in controversy at the time of removal,'" quoting *Allen*, 63 F.3d at 1335–36).

Defendants offer credible evidence regarding the size of the class, the number of former employees who are potential class members, the number of potential class members during the one year prior to the filing of the complaint, and the number of workweeks at issue.[80] Certain of defendants' assumptions, however, find no evidentiary support in the record. First, defendants assume that each class member worked three to five hours of overtime a week for which he or she was not compensated at the proper overtime rate.[81] Defendants contend such an assumption is reasonably based on Roth's allegation that "class member[s] regularly and/or consistently worked in excess of eight (8) hours in a day, in excess of twelve (12) hours in a day, and/or in excess of forty (40)hours in a week." [82] This statement simply does not support defendants' assumption that class members routinely worked three to five hours of overtime per week without receiving overtime pay. Nor have defendants attempted to support the assumption with evidence concerning the average hours worked ore recorded per week by class members.[83] Consequently, the court must conclude that defendants' calculation is speculative to the extent it relies on this assumption. See *Smith v. Brinker Int'l, Inc.*, No. C 10–0213 VRW, 2010 WL 1838726, *3 (N.D.Cal. May 5, 2010) ("The complaint does not quantify the number of overtime hours that are allegedly subject

---

79. Motion at 4, 6.

80. Moye Decl., ¶¶ 7–10.

81. Notice of Removal, ¶ 29.

82. Opposition at 12 (citing Complaint, ¶ 40).

83. At oral argument, defense counsel asserted that given the "off-the-clock" nature of plaintiff's overtime claims, records reflecting the average hours worked per week by class members would not assist in calculating the amount in controversy, since "off-the-clock" time would not have been recorded. This case differs from the usual "off-the-clock" case, however, in that plaintiff contends that defendants shifted hours from one day to another to avoid overtime payments rather than that they required employees routinely to work and record eight hours each day plus

additional time beyond eight hours "off-the-clock." Plaintiff's counsel, moreover, disputed defendants' assertion that their time records would not reflect the shifting of hours from one day to another. The court obviously cannot resolve this disagreement on the present record. It notes, however, that whatever defendants' time records reflect, they most probably contain some evidence that would support defendants' assumptions by showing the number of full- and part-time employees, the percentage of class members, if any, who recorded overtime, and what percentage, if any, of full-time employees recorded fewer than eight hours in a day on a regular basis. If only to confirm defendants' assumption that all putative class members were full-time employees, evidence of the average hours recorded per week by class members would be useful in confirming the reasonableness of defendants' calculations.

to compensation, nor the number of meal and rest periods that defendants allegedly failed to provide. Defendants provide no sufficient basis to apply its assumption of 2.5 overtime hours each day towards calculating the amount in controversy. The court may not base its jurisdiction on speculation and conjecture," citing *Lowdermilk*, 479 F.3d at 1002); *Martinez v. Morgan Stanley & Co.*, No. 09cv2937–L(JMA), 2010 WL 3123175, *5 (S.D.Cal. Aug. 9, 2010) ("Defendants use Plaintiff's allegation that she worked approximately 12 hours per weekday and approximately 60 hours per week and assume that every associate worked four unpaid overtime hours every work day. Although Plaintiff alleged that her claims are typical of the class as a whole and that class members consistently worked overtime, this does not provide a basis to assume that every class member worked any particular number of overtime hours, much less that he or she worked the same number of overtime hours every workday as Plaintiff did on an unspecified occasion" (internal citations to the record omitted)).

Second, defendants have assumed that all class members were denied meal and rest periods one to three times a week.[84] Defendant contends that such an assumption is "arguably conservative," given Roth's allegations that "class members did not take timely, uninterrupted [meal] periods," and were "not always given proper rest breaks." [85] Once again, these statements provide no basis upon which to conclude that class members were denied meal and rest periods one to three times per week. Defendants, moreover, have proffered no evidence demonstrating that it is more likely that class members missed meal and rest periods three times a week than that they missed them three times a month. See *Martinez*, 2010 WL 3123175 at *6 ("Plaintiff alleged that she 'frequently missed meal and rest periods' and that '[i]t was the environment at Morgan Stanley for Assistants to forego and work through his/her statutory right to rest breaks.' . . . Based on the foregoing, Defendants assume that assistants were not provided three rest or meal breaks per week. This assumption is unsupported by the allegations in the complaint or by evidence").

Third, defendants' calculation of other penalties or amounts generally presumes that there was a violation as to each class member during each relevant pay period. Defendants contend that it is appropriate to make such an assumption given Roth's allegations that class members "regularly and/or consistently" worked overtime, "often" missed meal or rest periods, and were not properly compensated in their paychecks.[86] The court agrees that Roth's allegations suggest all class members were denied some form of proper compensation during their employment, and that the underpayment was not corrected at end of their employment.[87] Thus, defendants can

---

84. Notice of Removal, ¶¶ 34–36.

85. Opposition at 13 (citing Complaint, ¶¶ 53, 30). If some class members worked part-time, as plaintiff suggested at oral argument, the number of required rest and meal periods would likely vary substantially across the class, and using defendants' standard estimate of one to three missed rest/meal periods across the class would appear inappropriate. Because defendants have provided no information regarding the number of part-time workers in the class, their calculation is unsupported for this reason as well.

86. *Id.* at 15.

87. Complaint, ¶ 75. For example, Roth states "class members' final paychecks did not include wages owed for, among other things, meal and rest break premiums or compensation for off-the-clock work." (*Id.*) Although Roth contends that he did not receive a final paycheck for "several weeks" after his departure, his waiting-time claim focuses on the fact that the amounts paid were inaccurate and never corrected. (*Id.*)

properly assume that all employees were entitled to maximum waiting time penalties under Labor Code § 203. Statements suggesting that overtime violations, missed meal and rest periods, untimely payment of wages, and/or provision of inaccurate wage statements occurred "regularly and/or consistently" or even "often," however, do not facially suggest that §§ 1197.1, 204, 226 were violated 100 percent of the time, i.e., in every instance where a putative class member worked overtime or missed a meal or rest period. Nor do the allegations suggest that wage statements were late and/or inaccurate for every pay period.[88]

Nor have defendants adduced evidence that would permit the court to draw an inference that these violations occurred with the frequency defendants presume, e.g., records of the average time worked by tellers that might suggest a high level of violations.[89] See *Alvarez v. Limited Express*, No. 07CV1051 IEG (NLS), 2007 WL 2317125, *4 (S.D.Cal. Aug. 8, 2007) ("The average time worked is a crucial number in calculating the amount in controversy. For every day that the employer does not provide the employee with a meal period or rest break, the employer must pay an additional hour of pay. And, for each pay period where the employer violates any provision of the Labor Code, the employer must pay a civil penalty of $100 per employee per pay period for the first violation and $200 per employee per pay period for every subsequent violation. Without 'summary judgment type evidence' from defendant concerning the av-erage time worked during the class period, the Court cannot accurately compute damages or civil penalties" (footnote and internal citations omitted)).

Accordingly, many of the assumptions that are key to defendants' damages calculations are not supported by summary judgment-type evidence. See *Korn*, 536 F.Supp.2d at 1205 ("[A] defendant must set forth the underlying facts supporting its assertion that the amount in controversy exceeds the statutory minimum"); *Kenneth Rothschild Trust*, 199 F.Supp.2d at 1001 ("If the amount in controversy is not clear on the face of the complaint, ... defendant must do more than point to a state law that might allow recovery above the jurisdictional minimum"). Defendants' estimation of potential waiting time penalties under § 203 is $992,160—far below the jurisdictional threshold. Defendants' calculation of potential attorneys' fees of $1 million is speculative because it is based on fees claimed by a particular lawyer in unrelated cases. Even if the court were to accept that those other cases reveal something about the type of fees plaintiffs will seek here, moreover, the estimate is dependent on the amount that can be recovered on the class's substantive claims for relief. As to those amounts, defendants have not adduced sufficient to support the speculative variables underlying their calculations.

### 3. Whether Defendants Can "Assume" Violation Rates to Fill in Gaps in Roth's Broad Allegations

As the court has found that several of the assumptions on which defendants'

---

**88.** In support of his claim under § 1197.1, for instance, Roth alleges that he "was often not paid an overtime rate for the overtime hours he worked." (Complaint, ¶ 69). Roth's claims under §§ 204 and 226 are similarly based on defendants' alleged failure to pay overtime rates or compensation for missed meal/rest periods. Roth alleges that this happened "often," not "always." See OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "always" as "at every time," on every occasion, at all times, on all occasions); *id.* (defining "often" as "many times; at many times; on numerous occasions; frequently; for a significant amount or proportion of the time").

**89.** Indeed, defendants dispute that violations occurred at all.

damages estimate is based are not supported by summary-judgment-type evidence, the analysis suggested by *Singer* for determining the amount in controversy on removal would appear to be at an end. 116 F.3d at 377. See *Harrington v. Mattel, Inc.*, C07–05110 MJJ, 2007 WL 4556920, *3 (N.D.Cal. Dec. 20, 2007) ("Because it is not clear from the face of the complaint if the jurisdictional amount in controversy is met, Defendants have the burden to prove, by a preponderance of the evidence, that the amount exceeds $5 million," citing *Matheson*, 319 F.3d at 1090).

In evaluating whether it is "more likely than not" wage-and-hour claims exceed the jurisdictional threshold, however, California district courts have disagreed as to whether defendants may assume certain variables—such as average hours of overtime worked per week or the rate of wage statement violations—in calculating the amount in controversy. Compare *Coleman*, 730 F.Supp.2d at 1150 ("Plaintiff included no limitation on the number of violations, and, taking the complaint as true, Defendants could properly calculate the amount in controversy based on a 100% violation rate") with *Smith*, 2010 WL 1838726 at *4 ("Defendants have failed to provide any evidence relating to either plaintiff's actual earnings or number of hours worked, asking the court to assume that each plaintiff worked an additional 2.5 hours each day in order to reach the amount in controversy threshold").[90]

When applying the preponderance of the evidence standard to California Labor Code claims, many California district courts have refused to credit damage calculations based on variables not clearly suggested by the complaint or supported

by evidence, concluding that the calculations are mere conjecture. In *Martinez v. Morgan Stanley*, for example, defendants sought to remove a wage-and-hour class action under CAFA and calculated the amount in controversy based in part on an assumption that every class member worked four hours of unpaid overtime every day. 2010 WL 3123175 at *5. The court rejected this assumption and the calculation of potential class damages based on it, stating "[a]lthough Plaintiff alleged that her claims are typical of the class as a whole and that class members consistently worked overtime, this does not provide a basis to assume that every class member worked any particular number of overtime hours." *Id.* The court similarly rejected the calculation of meal/rest period violations, waiting time penalties, and wage statement penalties because the variables used were not clearly suggested by the complaint or supported by evidence. *Id.* at *6. See also *Smith*, 2010 WL 1838726 *5 ("Because defendants' calculation of damages for alleged overtime and missed meal and rest periods is speculative and based on conjecture, the court limits the calculation of the amount in controversy to the reasonably certain amount of statutory penalties that could be claimed"); *Verner v. Swiss II, LLC*, No. CV 09–5701 PA (CTx), 2010 WL 99084, *3 (C.D.Cal. Jan. 6, 2010) ("In its Notice of Removal, Defendant alleges that because the First Amended Complaint alleges that Defendant 'consistently' violated California's wage and hour laws by failing to provide meal and rest periods, the amount in controversy is Plaintiff's hourly wage times 250 work days per year times three meal and rest break premiums per day times four years. Nothing in the First Amended

---

**90.** By contrast, district courts have uniformly held that defendants cannot meet the higher legal certainty standard by using assumed variables in calculating the amount in controversy. See e.g., *Green*, 2008 WL 5246051; *Fletcher*, 2009 U.S. Dist. LEXIS 126693; *Riddoch*, 2010 U.S. Dist. LEXIS 65799.

Complaint or the Notice of Removal supports a conclusion that the amount in controversy is three premiums for each day worked for the last four years. Defendant has no 'summary-judgment type evidence' to support its calculation of the amount in controversy for the unpaid meal and rest breaks"); *Guerrero v. R.R. Donnelley & Sons Co.*, ED CV 10–776 PA (AGRx), slip op. at 3 (C.D.Cal. July 26, 2010) ("Defendant's assumptions about the extent of Defendant's violations and the number of times that each class member experienced a violation are not supported by any allegations in the Complaint or any 'summary-judgment-type' evidence. Rather, Defendant's assumptions are the type of speculation and conjecture that are insufficient to show that the amount in controversy exceeds $5,000,000").[91]

Defendants correctly note, however, that several California district courts have relied on calculations of hour and wage claims that employ assumed variables where the complaint did not provide a basis for a clear calculation.[92] See, e.g., *Gardner v. GC Servs., LP*, No. 10–CV–997–IEG (CAB), 2010 WL 2721271, *3 (S.D.Cal. July 6, 2010) (crediting defendant's overtime calculation based solely on evidence regarding the number of potential class members, and stating "[a]ccording to Defendant, if those employees, earning on average $14.50 per hour, worked 30 minutes of overtime per day over four years, the unpaid overtime owed on the overtime claim would exceed $3,000,000"); *Lippold v. Godiva Chocolatier, Inc.*, No. C 10–00421 SI, 2010 WL 1526441, *3 (N.D.Cal. Apr. 15, 2010) (crediting defendants' calculation of the amount in controversy based on an assumption that plaintiff worked "13 hours a day every day" given an allegation that "he 'regularly and/or consistently worked in excess of 12 hours per day' "); *Coleman*, 730 F.Supp.2d at 1148–49 ("Plaintiff argues that Defendants cannot meet their burden of proof by assuming a 100% violation rate. However, courts have assumed a 100% violation rate in calculating the amount in controversy when the complaint does not allege a more precise calculation," citing *Korn*, 536 F.Supp.2d at 1205 ("Where a statutory maximum is specified, courts may consider the maximum statutory penalty available in determining whether the jurisdictional amount in controversy requirement is met") and *Alvarez*, 2007 WL 2317125 at *3 ("Here, paragraph 11 specifically describes the 'extreme workload' that made it 'virtually impossible' for defendant's employees to take meal periods and rest breaks. The same paragraph also describes the 'company culture' that discouraged meal periods and rest breaks. Having reviewed paragraph 11, the Court concludes plaintiff effectively alleges defendant did not allow any of its employees to take meal periods or rest breaks")); *Navarro v. Servisair, LLC*, No. C 08–02716 MHP, 2008 WL 3842984, *8 (N.D.Cal. Aug. 14, 2008) ("[Plaintiff] claims that he and others similarly situated regularly worked through their meal periods.... Thus, a full-time employee who has worked for a year with no daily meal period would be entitled to approximately two hundred fifty hours of back-pay, assuming that he works five days a week for fifty weeks per year"); *Muniz*, 2007 WL 1302504 at *4.

Several of these courts focused on the fact that plaintiff is the "master of the complaint," and commented that plaintiffs

---

**91.** Plaintiff's Request for Judicial Notice, Docket No. 24 (August 8, 2010), Exh. A.

**92.** Defendants also cite *Lyon*, 2010 WL 1753194 at *4, for this proposition. The *Lyon* court, however, expressly relied on an estimate of weekly overtime supplied by plaintiff. *Id.* ("Plaintiff's more conservative 2.5 hour overtime estimate will be used in estimating the overtime wages owed ...").

could choose to limit their damage claims. See *Muniz*, 2007 WL 1302504 at *4 ("[P]laintiff includes no fact-specific allegations that would result in a putative class or violation rate that is discernibly smaller than 100%, used by defendant in its calculations. Plaintiff is the 'master of [her] claim[s],' and if she wanted to avoid removal, she could have alleged facts specific to her claims which would narrow the scope of the putative class or the damages sought," citing *Caterpillar*, 482 U.S. at 392, 107 S.Ct. 2425). See also *Coleman*, 2010 WL 3156850 at *7 ("Plaintiff only broadly alleges his wage-and-hour violations.... Plaintiff included no limitation on the number of violations, and, taking his complaint as true, Defendants could properly calculate the amount in controversy based on a 100% violation rate").

The court finds these cases unpersuasive, however, as they improperly shift the burden to plaintiff to refute speculative assertions of jurisdiction and establish that there is no jurisdiction. See *Abrego*, 443 F.3d at 685 ("We ... hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction"). While defendants noted at oral argument that plaintiff has not denied the amount in controversy exceeds $5 million, defendants bear the burden on this issue. Plaintiffs are not required to offer an affirmative denial of speculative calculations of the amount in controversy. See *Smith*, 2010 WL 1838726 at *4 ("Defendants suggest that plaintiffs have not submitted evidence to dispute defendants' estimates, but plaintiffs do not bear the burden to demonstrate the amount in controversy"). Indeed, at this early stage of the litigation, neither side may be able to calculate potential damages reliably.

By crediting speculative estimates of the amount in controversy, moreover, the cases relied upon by defendants ignore the

" 'strong presumption' against removal jurisdiction." *Gaus*, 980 F.2d at 566 (citing *Nishimoto*, 903 F.2d at 712 n. 3 and *Emrich*, 846 F.2d at 1195). See also *id.* (the Ninth Circuit "strictly construe[s] the removal statute against removal jurisdiction," citing *Boggs*, 863 F.2d at 663 and *Takeda*, 765 F.2d at 818). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance," and "[t]he 'strong presumption' against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Id.* (citing *Libhart*, 592 F.2d at 1064).

It is, of course, true that a removing defendant is not responsible for "conduct[ing] a fact-specific inquiry into whether the rights of each and every potential class member were violated," answering "the ultimate question the litigation presents," or "try[ing] the case [itself] for the purposes of establishing jurisdiction." *Bryan v. Wal–Mart Stores, Inc.*, No. C 08–5221 SI, 2009 WL 440485, *3 (N.D.Cal. Feb. 23, 2009). Nonetheless, in evaluating whether a party has met its burden of proof with respect to jurisdiction, several circuits have held that it is proper for district courts to consider which party has access to or control over the records and information required to determine whether the amount in controversy requirement is met. See, e.g., *Amoche v. Guarantee Trust Life Insurance Co.*, 556 F.3d 41, 51 (1st Cir.2009) ("[D]eciding whether a defendant has shown a reasonable probability that the amount in controversy exceeds $5 million may well require analysis of what *both* parties have shown.... In the course of that evaluation, a federal court may consider which party has better access to the relevant information. See *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1164 n. 3 (11th Cir.2006) ('Defendants have better access to information about conduct

by defendants, but plaintiffs have better access to information about which plaintiffs are injured and their relationship to various defendants')"); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447–48 (7th Cir.2005) ("That the proponent of jurisdiction bears the risk of non-persuasion is well established.... Whichever side chooses federal court must establish jurisdiction; it is not enough to file a pleading and leave it to the court or the adverse party to negate jurisdiction.... And the rule makes practical sense. If the burden rested with the proponent of remand, then Countrywide could have removed without making any effort to calculate its maximum exposure, and without conceding that it had faxed thousands of ads. That would have thrown on Brill the burden of showing that Countrywide could not possibly have sent more than 3,333 junk faxes.... Brill would have no way to show this early in the litigation, and plaintiffs in other kinds of suits would encounter similar difficulty. When the defendant has vital knowledge that the plaintiff may lack, a burden that induces the removing party to come forward with the information—so that the choice between state and federal court may be made accurately—is much to be desired").

Here, defendants are in the best position to adduce evidence regarding the working hours and wages of their tellers. In support of their notice of removal, defendants could have proffered evidence regarding CMC's actual policies or practices. They could have conducted a sampling or other analysis demonstrating that it was more likely than not that many of their employees regularly worked more than eight hours in a day or forty hours in a week to support calculations regarding potential overtime claims. Adducing such evidence would not have required defendants to prove Roth's case or answer the "ultimate question" presented by the litigation. Defendants, however, failed proffer evidence

supporting their calculations regarding the amount in controversy.

Defendants argued at the hearing that employment records are not likely to reflect the number of "off-the-clock" hours class members allegedly worked. As noted, however, defendants' time records most probably contain some evidence that would support defendants' assumptions by showing the number of full- and part-time employees, the percentage of class members, if any, who recorded overtime, and what percentage, if any, of full-time employees recorded fewer than eight hours in a day on a regular basis. If only to confirm defendants' assumption that all putative class members were full-time employees, evidence of the average hours recorded per week by class members would be useful in confirming the reasonableness of defendants' calculations. More fundamentally, it is defendants who bear the burden of proof on the amount in controversy. The fact that particular types of evidence may not be available to calculate that amount is not a reason to relieve defendants of their burden or to accept speculative calculations. Consequently, the court concludes that defendants have not carried their burden of proof regarding subject matter jurisdiction. As a result, remand is appropriate. Cf. *Smith*, 2010 WL 1838726 *5 (recognizing that "should subsequent developments in superior court establish an amount in controversy exceeding" the jurisdictional threshold, defendants could again seek removal under 28 U.S.C. § 1446(b). "That, however, will come—if at all—on another day").

## III. CONCLUSION

For the foregoing reasons, the court concludes that it lacks subject matter jurisdiction over this action. Accordingly, it

directs the clerk to remand the action to Los Angeles Superior Court forthwith.